**UNITED STATES of America,**

**v.**

**John CAPRA et al., Defendants.**

**No. 73 Cr. 460.**

United States District Court, S. D. New York.

Jan. 8, 1974.

See also, D.C., 372 F.Supp. 600, 603.

———◆———

Barry I. Slotnick, New York City, for John Capra.

Dennis D. S. McAlevy, Jersey City, N. J., for Leoluca Guarino.

Lawrence K. Feitell, New York City, for Stephen Della Cava.

Leonard J. Levenson, New York City, for Robert Jermain.

David Blackstone, New York City, for George Harris.

Joseph I. Stone, New York City, for Alan Morris.

Paul J. Curran, U. S. Atty., S.D.N.Y., Gerald A. Feffer, Lawrence S. Feld, Asst. U. S. Attys., for the government.

## MEMORANDUM ON PRETRIAL PUBLICITY

FRANKEL, District Judge.

The events leading to the trial in this case included actions by law enforcement officers resulting in massive and lurid publicity for their activities. The defendants herein were among scores taken in a "roundup" in the night and morning of April 13–14, 1973. The numerous arrests were supposedly to be accomplished with the utmost secrecy. Yet press reporters and photographers were invited to be present, and at work, through all the stages of the operation.

On the night of April 13, 1973, the officers scheduled to participate in the arrests assembled for instructions in a carefully cloaked meeting at the headquarters of the Bureau of Narcotics and Dangerous Drugs (BNDD). The watchword, we are told, was D-Day style security. However, those in attendance included newspaper and magazine photographers and reporters, busily taking photographs of the officers, not omitting high-ranking police officers and top members of the United States Attorney's staff.

As the arresting officers fanned out for their missions throughout the New York metropolitan area, media people went along. Some of the official vehicles (it is not clear how many) carried photographers and reporters as well as the law enforcement people who must be presumed to have been the only ones properly authorized to be in such vehicles at such a time. It appears that one or more reporters actually entered the homes of arrestees with the officers so that they might describe the detailed circumstances of the arrests, home furnishings, and other essentials that the people are said to have a right to know.

There was little if any serious violence attending the arrests, but action scenes were caught and recorded in the exuberant flashing of camera lights. The arrested people were photographed coming from their homes, clubs, and elsewhere. Cameramen, all duly alerted, were ready at BNDD headquarters and elsewhere to show the arrested people, including an old lady, variously handcuffed, "struggling" in the fierce grip of official hands on each arm, attempting to conceal their faces, or otherwise portraying their roles in the drama.

The press in this area had a ball for a couple of days in the week subsequent to the arrests. The roundup was described in intimate, paperback detail—the tension of the secret briefings, the bantering of officers all wound and ready to spring, the long accounts of patient sleuthing leading to this finale. There were the usual references to "reputed organized crime figures." A reporter for the sedate *Times* captured on the front page the "sense of exhilaration." He told how many of the arresting officers were themselves kept in the dark until the very last minute. A Deputy Police Commissioner was quoted as saying on the critical evening before the arrests:

"We cannot have a leak. We cannot have a leak now. This is a historic night. So I want to wish each of you good luck."

Reflecting further this sense of history, the same high official was quoted in another press organ as saying the roundup made "the French Connection case look like a pebble compared to a boulder." Months later, at the trial of the instant case, a government chemist was to exhibit a similar instinct for what counts in history. Asked about a crude testing device for heroin, he found it useful as a scientist to compare it to devices seen in the motion picture. "The French Connection." The expectable motion for a mistrial was denied

then, as have been other arguments to defeat this prosecution, but matters of this kind may yet take on a more sinister aspect when viewed from some appellate height. It is to be questioned in any event how clearly the ends of justice are perceived in an atmosphere where it has become so habitual to hold the mirror of nature up to Hollywood's art.

■ Other details of the publicity may be omitted for present purposes. They are in the court's record for reference on review and otherwise.[1]

Enough has been mentioned to make clear, it might be thought, why the court found in these matters grounds for concern. The troublesome problem of reconciling freedom of the press with the right to a fair trial is familiar to everyone. This court, like others, has a rule on the subject, which appeared very possibly to have been violated.[2] The Department of Justice also has a commendable-sounding rule, which might be read to proscribe press briefings and photographic arrangements for "secret" arrests on serious indictments.[3] The ques-

1. Defendants request a hearing to develop more fully the details of the publicity and of governmental participation in generating it. As is suggested below, the court is not persuaded that the account we have is by any means complete. The request is denied, however, on the premise that further elaboration of the facts would not alter the conclusion that the court should not attempt any specific form of remedial action at this time.

2. Our Criminal Rule 8, entitled " 'Free Press–Fair Trial' Directives," provides in part as follows:

"(a) It is the duty of the lawyer not to release or authorize the release of information or opinion for dissemination by any means of public communication, in connection with pending or imminent criminal ligitation with which he is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

"With respect to a grand jury or other pending investigation of any criminal matter, a lawyer participating in the investigation shall refrain from making any extrajudicial statement, for dissemination by any means of public communication, that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers, or otherwise to aid in the investigation.

"From the time of arrest, issuance of an arrest warrant or the filing of a complaint, information, or indictment in any criminal matter until the commencement of trial or disposition without trial, a lawyer associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement, for

dissemination by any means of public communication, relating to that matter and concerning:

"(1) The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused, except that the lawyer may make a factual statement of the accused's name, age, residence, occupation, and family status, and if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in his apprehension or to warn the public of any dangers he may present;

"(2) The existence of contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement;

"(3) The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;

"(4) The identity, testimony, or credibility of prospective witnesses, except that the lawyer may announce the identity of the victim if the announcement is not otherwise prohibited by law;

"(5) The possibility of a plea of guilty to the offense charged or a lesser offense;

"(6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case."

3. Department of Justice regulations published at 28 CFR § 50.2 provide in seemingly pertinent part:

"(a) *General.* (1) The availability to news media of information in criminal and civil cases is a matter which has become increasingly a subject of concern in the administration of justice. The purpose of this statement is to formulate specific guidelines for the release of such information by personnel of the Department of Justice.

\*　　\*　　\*　　\*　　\*

tion of the integrity of the Department's own functioning might have been supposed to cause concern in that quarter, quite apart from the now familiar principle that an agency may deny due process if it fails to obey its own regulations. E. g., United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 266–268, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Service v. Dulles, 354 U.S. 363, 388–389, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Yellin v. United States, 374 U. S. 109, 120–121, 83 S.Ct. 1828, 10 L.Ed. 2d 778 (1963). As for the court itself, our "supervisory power," if it means something, must entail an alert sensitivity to indications that the federal prosecutor and/or federal law enforcement officers have participated in, or quietly condoned, transgressions against court rules, executive rules, and commands of the Constitution.

Accordingly, after the verdicts had been returned in this case, the court, in a memorandum dated November 27, 1973, directed the United States Attorney to explain and comment upon the above-described events. Specific questions were put to develop some facts about the publicity, the roles of government counsel and law enforcement officers, the views of the government as to whether there had been improprieties, and the possible needs for remedial action by the United States Attorney, the court, or both. Defense counsel were invited, of course, to present their positions.

Perhaps surprisingly, at least to this court, the initial response of the United States Attorney was a five-page letter explaining why no response should be required on the merits of the questions. First of all, in a probably accurate observation, the United States Attorney took issue with the statement in our November 27 memorandum that the subject of publicity had been "left for further consideration at a later time." Whatever the court may have had in mind, it does not appear that any formal "reservation" of this nature was made on the record. Then the United States Attorney reminded us that the usual precautions had been taken in selecting the jury; that the required assurances had

"(b) *Guidelines to criminal actions.*

"(1) These guidelines shall apply to the release of information to news media from the time a person is the subject of a criminal investigation until any proceeding resulting from such an investigation has been terminated by trial or otherwise.

"(2) At no time shall personnel of the Department of Justice furnish any statement or information for the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial.

"(3) Personnel of the Department of Justice, subject to specific limitations imposed by law or court rule or order, may make public the following information:

"(i) The defendant's name, age, residence, employment, marital status, and similar background information.

"(ii) The substance or text of the charge, such as a complaint, indictment, or information.

"(iii) The identity of the investigating and/or arresting agency and the length or scope of an investigation.

"(iv) The circumstances immediately surrounding an arrest, including the time and place of arrest, resistance, pursuit, possession and use of weapons, and a description of physical items seized at the time of arrest.

"Disclosures should include only incontrovertible, factual matters, and should not include subjective observations. In addition, where background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial or where the release thereof would serve no law enforcement function, such information should not be made public.

\*　　\*　　\*　　\*　　\*

"(7) Personnel of the Department of Justice should take no action to encourage or assist news media in photographing or televising a defendant or accused person being held or transported in Federal custody. Departmental representatives should not make available photographs of a defendant unless a law enforcement function is served thereby."

been given by those selected; and that there were no grounds in our record for claims of error in this respect. It was said that "[i]f an inquiry relating to pre-trial publicity were ever appropriate in this case, surely it could have been conducted before and not after the conclusion of a five-week jury trial."[4]

The demurrer was overruled. The United States Attorney then proceeded to give his responses to our inquiries. In the paragraphs following this one, we set out, first, each of the eight numbered categories of information called for by the court, then the respective submissions in response from the United States Attorney, in full or essential part, and thereafter the court's comments in instances where comments have seemed appropriate.

"(1) A listing of the media representatives (reporters, photographers, and any others) who were present at the assembly of law enforcement officers on the night of April 13, 1973, at B.N.D.D. headquarters, or at any other such meeting, where instructions for the arrests were given."

*Response*: "No media representatives were present at any meeting 'where instructions for the arrests were given.' Three reporters and two photographers were present for a limited time at an assembly of law enforcement officers at Drug Enforcement Administration ('DEA') headquarters, 555 West 57th Street, New York, N.Y. . . . Their limited presence and the reasons for it are set forth in No. 6, below."

*Comment*: Defendants in answer point out that the press stories appearing soon after contained what purported to be detailed police information: e. g., as to an arrestee having a machine gun, as to the total number to be arrested, as to conversations about their mission among the police officers. *The New York Times* on its front page for Tues-

day, April 17, 1973, purported to quote and describe first-hand the address of the BNDD Assistant Regional Director outlining to the assembled officers things like the composition of the arresting teams, the use of code names and armbands, the location of his own command post, the procedure for handling prisoners, and other items of instruction. The United States Attorney's brief assurance may be literally consistent with all this, but it does not necessarily volunteer a rounded picture. If the details were vital for the present, we would surely require the evidentiary hearing defendants propose (note 1, *supra*).

"(2) A listing of such representatives, along with an indication of their respective media, who accompanied arresting officers on their arrest missions of April 13–14."

*Response*: Three named journalists "accompanied law enforcement personnel on the arrest of John Capra only."

*Comment*: This is presumed to be literally true, provided we take pains, as the United States Attorney evidently did, to read the court's question as referring only to the few "arrest missions" involved directly in the instant case. However, the newspaper accounts showed that journalists fanned out all over the metropolitan area, obviously knowing where to go (or being taken), to cover other arrests, which were then recounted in colorful detail as well as in photographs.

"(3) A list of the names of those supervisory personnel of the law enforcement agencies who authorized the presence of these media representatives."

*Response*: Presence of media representatives was authorized by the Chief of Domestic Enforcement of the Drug Enforcement Administration and New

4. Apart from its immateriality, the contention seems unsound. Our trial began in October, six months after the publicized arrests. To revive the publicity by a hearing about it was not clearly desirable. The court is not required in the circumstances to treat the subject as forever closed.

614

York City's Deputy Police Commissioner for Organized Crime Control.

"(4) A statement as to whether the United States Attorney or his representatives joined in such authorizations."

*Response*: "No."

*Comment*: Good.

"(5) If the answer to "(4)" is no, a statement whether responsible members of the United States Attorney's office (a) knew of, (b) acquiesced in, or (c) opposed such participation by media representatives. If there was opposition, state who expressed it and how."

*Response*: The Chief of the United States Attorney's Narcotics Unit and an Assistant United States Attorney, destined to try the instant case, were at the briefing session. Fifteen minutes before it began the Narcotics Unit Chief "learned for the first time that media representatives were to attend the session. [He] expressed disapproval to [the Drug Enforcement Chief and the Deputy Police Commissioner] but was assured by [the latter] that their presence was necessary in order to avoid 'leaks.' [The Commissioner] told [the Narcotics Unit Chief] that he had commitments from the heads of the newspapers involved that this would prevent news of the arrests from being prematurely leaked. [The Unit Chief] was not told nor did he learn until well after the events that media representatives were permitted to accompany law enforcement personnel on the arrest of John Capra."

*Comment*. This ought to be recognized to be as unacceptable as it is disheartening. Such a record of feeble, ineffectual protest is not more reassuring than the report about the strategy for dealing with "leaks." Have we indeed become so impotent that we must open the floodgates to selected press people to prevent leaks? Does the United States Attorney, who reports this without comment, believe this is the best we can do? Holmes was surely right when he

said judges are naive. Perhaps it is better so. But we must be permitted to hope that resignation to the disaster here described may not be compelled. At a minimum we would wish to go back to our English mentors to consider how they, merely human, manage this business so much better.

"(6) A statement by the United States Attorney as to whether the participation of media representatives should be deemed to have been proper."

*Response*: "In the light of the considerations disclosed to this office after the fact, I cannot say that the limited presence of media representatives at this briefing session was illegal or improper.

"With respect to accompanying law enforcement personnel on the arrest set forth in No 2, above, under the circumstances as I understand them, I regard this as ill-advised and would not have approved of it. However, defendant Capra was not prejudiced in his right to a fair trial by this development.

"The facts and considerations on which my answers to this question are based are set forth in [a Drug Enforcement Administration] report of May 21, 1973 to then United States Attorney Whitney North Seymour, Jr., a copy of which is attached."

*Comment*: This vies with the two succeeding responses for the position of most discouraging. We are told in effect that the kind of glamourized, adventure-story press accounts preceding the instant trial may be expected to recur. It is perhaps a small answer, but enough for now from a *nisi prius* judge, to say that repetitions of such performances, now that the matter has been considered in all its gravity, should lead to sterner and more positive action by the court than mere expressions of disapproval. In the meantime, we invite further study by the United States Attorney, hopeful that such attention may produce sharper restrictions at the law enforcement sources upon these varieties of press coverage.

"(7) A statement by the United States Attorney as to what remedial action, if any, he has taken or proposes to take. State, for example, whether consideration has been given to the institution of contempt or other proceedings under this Court's Criminal Rule 8."

*Response*: "Shortly after these arrests Whitney North Seymour, Jr., then United States Attorney, expressed disapproval to [DEA's Domestic Enforcement Chief], based upon the press coverage, of the manner in which arrests were handled insofar as the press was concerned and requested [the latter] to supply a full written report about the press coverage surrounding the execution of the arrests and during the period preceding the arraignment. As noted in No. 6 above, [the latter's] report dated May 21, 1973 is attached. This constitutes the remedial action taken by the United States Attorney concerning this matter. No consideration has been given by this office to the institution of contempt or other proceedings under Rule 8 of Criminal Rules of this Court, since Rule 8 by its terms applies only to lawyers and courthouse personnel."

*Comment*: The "remedial action" is unimpressive. Mr. Seymour is to be commended for his concern in this, as in other things. It is striking, however, that nothing whatever seems to have been done at any higher level. After all, both the Drug Enforcement Administration and the United States Attorney are under the Department of Justice. We might have hoped that some top official in the Department, its regulation (note 3, *supra*) having been flouted, would have taken steps to back up the vain expressions of "disapproval" by the United States Attorney. It may be imagined that steps will yet be taken. If they are not, this case may become part of a demonstration that the courts must move against the evil with such weapons as they have available.

"(8) A statement of position as to what remedial action, if any, should be taken by the court."

*Response*: "It is the Government's position that under the circumstances no remedial action by the Court is warranted. However, in order to avoid any possible future problems of this nature, it may be in order for the Court to consider recommending that Criminal Rule 8 of this Court be amended to apply to appropriate investigative agencies in addition to lawyers and courthouse personnel."

*Comment*: Again, the court regrets that our executive officers deem themselves unwilling or unable to clean their own houses. Creative voices tell us that the best (or, at least, the first) hope for law enforcement that is at once civilized and effective lies in imaginative self-regulation by the law enforcers themselves. See Section 2.1 of the ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press 21–23 (Approved Draft, 1968); McGowan, Rule-Making and the Police, 70 Mich.L.Rev. 659 (1972).

Before essaying the cruder and more expensive device of judicial remedies, the court urges that the prosecutor reconsider the stance here expressed.

■ We end the present subject, for this case, at this judicial level, on a note that is not resounding. Defendants have moved to dismiss the indictment or have their convictions set aside because of the publicity extravaganza herein considered. This court, subject to wiser opinions from above, deems such relief excessive and unjustifiable. The guilt of the defendants is clear. Their crimes are atrocious. The trial does not seem perceptibly to have been infected by the publicity of some months earlier.

At the same time, it seems fitting to underscore that the mere gnashing of judicial teeth should not remain the sole response to such law enforcement behavior. We hear a lot these days about the subversion of law and order by rules like that of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), excluding good evidence "merely" because it was lawlessly gotten. The prisoner

must not lightly be freed because the constable has blundered. On the other hand, if the constable assures that he can do no other than blunder some more, the time must come when we either surrender our professed rights or enforce them as well as we can.

The United States Attorney scarcely embraces the whole of the matter when he concludes in this case that this particular trial has not been demonstrated to have been vitiated by sordid publicity. We assure trial juries every day that an indictment may not be taken as evidence. We mean that in a profound sense even though we expect our grand juries to have evidence before they indict. But the atmosphere and our principles are polluted if the indictment and arrest become the circuses they too often are, complete with prosecutors' press conferences and photographic spreads.

This court will expect that the response of the United States Attorney to these cautionary reminders will be consonant with the traditions of his great office.