STATE of Minnesota, Respondent,

v.

Jeffrey Scott BUSWELL,
Appellant, (C5–89–555)

Gary Lee Schwartzman,
Appellant, (CX–89–1166)

Dale Jay Schmidt, Appellant.
(C5–89–1169).

Nos. C5–89–555, CX–89–1166
and C5–89–1169.

Court of Appeals of Minnesota.

Dec. 26, 1989.

Review·Granted Feb. 21, 1990.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, Stephen C. Rathke, Crow Wing County Atty., Brainerd, for State.

Robert W. Owens, Jr., Heuer & Associates, Minneapolis, for Jeffrey Scott Buswell.

Steven J. Meshbesher, Meshbesher Birrell & Dunlap, Minneapolis, for Gary Lee Schwartzman.

Richard D. Genty, Winsted, for Dale Jay Schmidt.

Heard, considered and decided by PARKER, P.J., and CRIPPEN and BOWEN,* JJ.

## OPINION

CRIPPEN, Judge.

Appellants contend their fourth amendment rights were violated by security agent searches at the gateway to Brainerd International Raceway. The trial court concluded the policing activity was private. We reverse and remand.

## FACTS

Each appellant was charged with possession of controlled substances. After a consolidated omnibus hearing, the trial court determined that the evidence seized was the product of a private search and denied appellants' motions to suppress the evi-

---

* Acting as judge of the Court of Appeals by ap-     pointment pursuant to Minn. Const. art. VI, § 2.

dence. Appellants waived their rights to a jury trial and were found guilty as charged by the trial court.

Appellant Dale Jay Schmidt was stopped in his borrowed pickup camper by Bruce Gately, a private security agency employee outside the entrance to Brainerd International Raceway on August 18, 1988. Gately asked Schmidt to unlock the back door of the camper portion of his vehicle so Gately could see if any persons were attempting to enter the race without paying the admission fee. After Schmidt unlocked the back door, Gately looked into the rear of the camper, entered it, opened a closet and discovered a small, green tackle box which contained cocaine. Gately then handcuffed Schmidt and his passenger to a fence pending the arrival of law enforcement officials.

Appellants Jeffrey Scott Buswell and Gary Lee Schwartzman were also stopped by Gately upon their arrival at the racetrack on August 18. While searching their converted bus, Gately discovered contraband inside a closet and a closet drawer. Subsequently, Buswell and Schwartzman were handcuffed to a fence and law enforcement officials were summoned. More contraband was found after the bus was seized and searched, and cocaine was discovered on appellants after they were taken into custody.

In each instance, the searches were conducted by a private security guard employed by North Country Security. North Country Security is owned by Keith Emerson, a Brainerd police officer and a special deputy for the Crow Wing County Sheriff's office.

Emerson contracted with the Brainerd raceway to provide security at the track, which is located on private property about six miles outside Brainerd, in Crow Wing County. He was responsible for hiring security guards and managing the security arrangements. For the weekend at issue, Emerson employed 127 guards, seven of whom were police officers.

In May of 1988, prior to the racing season, Emerson conferred with the Crow Wing County Sheriff and a local Bureau of Criminal Apprehension agent to determine the procedures that would be employed when his security guards seized contraband or uncovered other illegal activity. It was agreed that if any circumstances encountered by Brainerd security guards seemed to warrant an arrest, Emerson would be called first. After reviewing the situation, he would then decide whether to call in law enforcement officers. Arrangements were made for Emerson to contact Dave Bjerja, a Crow Wing County deputy sheriff and a special BCA agent, when someone was held for further police action.

At approximately 6:00 a.m. on the day of the searches, Emerson convened a meeting with his employees to discuss security arrangements for the weekend's races. At this meeting, Emerson told his employees that vehicles were to be searched for nonpaying persons. Emerson testified, however, that there was also a standing rule that vehicles are checked on a random basis for contraband.

## ISSUE

Did the searches conducted by private security personnel at the entrance to Brainerd International Raceway constitute public police action, governed by fourth amendment limitations?

## ANALYSIS

Appellants contend the random searches at issue were not private activity and should have been subject to the constraints set forth by the fourth and fourteenth amendments. They argue that there was sufficient evidence of public action to implicate the constitutional prohibitions against unreasonable and warrantless searches and that evidence obtained was illegally seized and should have been suppressed.

It is well-settled that the fourth amendment applies only to governmental action. *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). This rule of law has been followed in Minnesota. *See State v. Kumpula*, 355 N.W.2d 697, 701 (Minn.1984); *State v. Hodges*, 287 N.W.2d 413, 416 (Minn.1979). The difficulty often arises, however, as it

does here, in determining when governmental action occurs. There is no single authority directly bearing on this issue.

■ The public-private classification is made with awareness that constitutional rights of the citizen must be protected. We are to liberally construe those constitutional provisions which provide for the security of person and property. *See Coolidge v. New Hampshire*, 403 U.S. 443, 453–54, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). Courts have recognized the dangers in creating a simplistic division between private and public sectors when interpreting the fourth amendment.

> To err on the side of a restrictive interpretation of the Fourth Amendment would be to sanction the possibility of widespread abuse of the privacy rights of individuals by private security guards.
>
> \*    \*    \*    \*    \*    \*
>
> Ill-trained in the subtleties of the law of search and seizure, private security guards are more likely than public law-enforcement officials to conduct illegal searches and seizures. In addition, private security guards have accoutrements of office that tend to radiate an air of authority not possessed by other private individuals. Of particular importance are the uniform and badge, both regulated by the state.

*People v. Holloway*, 82 Mich.App. 629, 634, 267 N.W.2d 454, 459 (1978) (Kaufman, Judge, concurring).

The Supreme Court formulated the following standard in *Coolidge:*

> The test \* \* \* is whether [the private citizen], in light of all the circumstances of the case, must be regarded as having acted as an 'instrument' or agent of the state \* \* \*.

*Coolidge*, 403 U.S. at 487, 91 S.Ct. at 2049. The Court recently reiterated this position and stated that the fourth amendment does not apply to a private search or seizure *unless* the private party acted as an instrument or agent of the government. *Skinner v. Railway Labor Executives Ass'n*, — U.S. ——, ——, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989).

Case law identifies several determinants of public involvement. Our consideration of these factors leads us to the conclusion that the searches in the present case were public. As these factors are examined here, we review the record with respect for the additional rule of law that appellants have the burden to show by a preponderance of evidence that the security searches here were not private in nature. *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir.1987).

### 1. *Official Police Involvement.*

■ Whether a private party should be considered an agent or instrument of the government for purposes of the fourth amendment turns initially on the degree of the government's participation in the private party's activities. *Skinner*, — U.S. at ——, 109 S.Ct. at 1411. "The fact that the government has not compelled a private party to perform a search does not, by itself, establish that the search is a private one." *Id.* Governmental participation may be found where the government does something more than adopt a passive position toward underlying private conduct. *Id.*

Before a private party's actions can be attributed to the government, some degree of government instigation must be shown. *United States v. Luciow*, 518 F.2d 298, 300 (8th Cir.1975). This may be in the form of governmental direction, authorization, or knowledge of the illegality. *Id.* The fourth amendment may apply if the government participates in a search or encourages a private party to conduct a search. *Gundlach v. Janing*, 536 F.2d 754, 755 (8th Cir.1976).

A search is not private in nature if it has been ordered or requested by a government official. 1 W. LaFave, Search and Seizure § 1.8(b), at 178 (2d ed. 1987). Similarly, governmental involvement has been found to exist when private security guards act pursuant to customary procedures agreed to in advance by the police. *See Murray v. Wal–Mart, Inc.*, 874 F.2d 555, 559 (8th Cir.1989); *El Fundi v. Deroche*, 625 F.2d 195, 196 (8th Cir.1980).

In the instant case, a meeting occurred where public officials and private security personnel reached an understanding regarding arrest procedures to be utilized upon the discovery of contraband by the private guards. Although this meeting dealt with the aftermath of searches, and not the manner of searching, the meeting produced a standing arrangement for contacts by the supervising security agent with police during the hours of operation, and a police officer was designated on call to assist with arrests. Emerson testified he was to be the intermediary between the security person conducting the search and the police; as he explained: "They wanted a law enforcement officer making the phone calls which would be for two reasons. One, I am in charge of security and I am a licensed officer."

### 2. Service of Public Policing Function.

Regardless of direct police involvement, systematic use of random contraband searches serves the general public interest and may reflect pursuit of criminal convictions as well as protection of private interests. *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), supplies the basis for concluding that private investigators and police may be subject to the fourth amendment where they are with some regularity engaged in the "public function" of law enforcement. *Id.* at 506, 66 S.Ct. at 278. *See* 1 W. LaFave, § 1.8(d) at 200. *See also Feffer*, 831 F.2d at 739 (private purpose to assist police considered along with government acquiescence in conduct).

Private security guards may share with police an interest in public prosecutions premised on the results of a private search. Here, as already pointed out, the interest of the police was demonstrated in the prior meetings between Emerson and law enforcement officials regarding the procedures to be used. Where some pre-search contact between the private party conducting the search and a potentially interested government official is shown, influence may be inferred. 1 W. LaFave, § 1.8(e) at 211 n. 151. The security guards were clearly aiming at discovery of contraband

and public prosecution of offenses thus discovered. This was so notwithstanding any private interest in controlling drug-induced misconduct. Emerson testified that vehicles were to be checked on a random basis for contraband.

In addition, private security personnel were utilized here to police a major public activity. Private security guards have been increasingly used as supplements for police protection and perform functions similar to licensed police officers. Here, Emerson employed approximately 127 guards, seven of whom were police officers, for the weekend races at the Brainerd raceway overseeing approximately 78,000 spectators.

Finally, the police-like clothing, equipment, and procedures gave North Country Security personnel the appearance of public authorities. *See Holloway*, 82 Mich.App. at 634–35, 267 N.W.2d at 459–60. They wore grey uniforms with badges. Gately carried handcuffs and a gun. Emerson acknowledged that the security guards might look like police officers to the average person. Combined with the use of the police arrest process (handcuffing appellants to fences, conducting body searches), the role of these private security agents extended to a police function, not merely affording private protection.

### 3. Boundaries of Reasonable Private Policing.

When intrusion goes beyond a reasonable and legitimate means for protecting private property, the practice suggests a need for constitutional protection of individual liberty. *Commonwealth v. Leone*, 386 Mass. 329, 334, 435 N.E.2d 1036, 1041 (1982). The public does not reasonably anticipate, we conclude, a private prerogative for random searches, a regular part of admission to a public event, which are more intrusive than permitted for police authorities. We have examined, in this regard, the nature of the intrusion in the circumstances of this case.

Gately's searches of appellants' vehicles were evidently conducted without consent.

Appellants were not given the option of being searched or leaving the raceway. Moreover, Gately exceeded the announced scope of the searches. Although appellants were told that he was only looking for persons trying to enter the race without paying, Gately searched areas of appellants' vehicles which could not possibly have hidden a person. He also testified that the purpose of the searches was to look for contraband as well as trespassers.

### 4. *Police Personnel.*

Finally, the identity of private security employees as off-duty policemen is an additional factor to be weighed. *See Williams v. United States*, 341 U.S. 97, 99, 71 S.Ct. 576, 578, 95 L.Ed. 774 (1951) (special police officer who operated a detective agency acted under color of law, and not as a private person, when he used brutal methods to obtain confessions from alleged thieves after being hired by a privately-owned company). Such officers are formally affiliated with the government and usually given authority beyond that of an ordinary citizen. Thus, they may be treated as state agents and subject to the constraints of the fourth amendment. *Leone*, 386 Mass. at 333, 435 N.E.2d at 1040 (comparing public and "purely private" searches).

Emerson, a long-time licensed police officer and special deputy, directed and authorized the searches and instructed security personnel. As a result, private actions became entwined with governmental policies. *See Evans v. Newton*, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966). Emerson cannot escape fourth amendment limitations by directing a third party to perform a search he could not otherwise conduct himself. *See United States v. West*, 453 F.2d 1351, 1356 (3rd Cir.1972).

In sum, we observe a combination of factors requiring the conclusion that the activity of private security personnel in this case took on a public character. There was significant official police involvement as indicated by the pre-search meetings between Emerson and law enforcement officials. North Country Security agents were engaged in the "public function" of law enforcement. Emerson, as well as a number of the security agents, were licensed police officers. Finally, the searches involved a significant degree of intrusion.

### DECISION

Because the trial court concluded the search was private, it did not address evidence and argument on the fourth amendment issue. On remand, the trial court must weigh the issues for unreasonableness in the search activity, including consent for the scope of the search and the question of whether any contraband was found in the agent's plain view.

Reversed and remanded.

BOWEN, Judge (dissenting).

I respectfully dissent. The record before us and before the trial court does not support the majority's conclusion, even applying the majority's criteria, that the searches here were public rather than private.

I agree with the majority that the test, enunciated in *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971), and most recently reiterated by the Supreme Court in *Skinner v. Railway Labor Executives Association*, — U.S. —, —, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989), is whether the private citizen who conducted the search and seizure acted as an instrument or agent of the government. I part company with the majority, however, on the issue of whether the application of their criteria, or any other criteria recognized by case law, establishes that either Gately or his boss, Emerson, acted here as an instrument or agent of Crow Wing County or the State of Minnesota.

The meeting between Emerson and law enforcement personnel, discussing procedures to be followed upon discovery of contraband, was not initiated by the BCA or by the county sheriff; rather, it was held to inform Emerson how to contact a law enforcement officer to take over after Emerson or one of his employees discovered contraband and made a citizen's arrest

on the BIR property. The law enforcement personnel attending the meeting gave no instructions as to how searches or arrests were to be made. They did, however, insist that one individual, Emerson, call them in, rather than be subjected to the prospect of being called by any of 60 security guards. On the law enforcement side, one deputy sheriff, Dave Bjerga, was assigned as the individual to be called by Emerson. Bjerga, however, was not standing by awaiting calls, but went on performing his regular duties. (In fact, when he was called by Emerson about the searches and arrests here, he was on his way to Long Prairie on another case.) The meeting was the result of Emerson's legitimate concern, on behalf of his private employer, about the logistics of promptly turning over citizen's arrestees to a peace officer, both to comply with statutory requirements and to avoid liability for false arrest. The meeting did not constitute the government instigation or participation required to make these "public" searches. See 1 W. LaFave, Search and Seizure § 1.8(b), at 178 (2d ed.1987).

BIR had an obvious legitimate interest in avoiding open drug use or drug-induced behavior on its property, something which could jeopardize its continuation in business. BIR initiated entrance-gate vehicle searches to insure that no one entered without having paid for admission, as well as to keep order. The record is devoid of any evidence that BIR's primary purpose was the assistance of public authorities in the prosecution of persons for drug violations.

Admittedly, Gately's searches would not have passed fourth amendment muster had they been public searches. However, I can find no authority for assuming a nexus between the unreasonableness of a search and its public or private nature. The fact that Gately engaged in conduct forbidden to a police officer does not make his searches public.

Finally, the fact that seven of Emerson's 127 employees were moonlighting policemen from other jurisdictions does not bring this case within *Williams v. United States,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774

(1951). These security guards are not formally affiliated with the government and have no authority beyond that of an ordinary citizen. We cannot treat them as state agents on the record before us. In referring to Emerson as "a long-time licensed police officer and special deputy," the majority fails to note that Emerson was a Brainerd police officer, that the BIR is not located in the City of Brainerd, and that Emerson had no authority as a special deputy to make arrests. Neither Emerson nor Gately could lawfully conduct a search or make an arrest *except as a private citizen.* Nor did either of them hold himself out as a police officer in making the searches and arrests in question.

I find nothing in the majority's reasoning, or in this record, to convince me that Emerson's and Gately's conduct was government-instigated, or that the state or county participated therein. I believe the searches were private searches, not covered by the fourth amendment; I would affirm the judgments of conviction.