STATE of Minnesota,
Petitioner, Appellant,

v.

Jeffrey Scott BUSWELL, Gary Leek
Schwartzman, and Dale Jay
Schmidt, Respondents.

Nos. C5–89–555, CX–89–1166
and C5–89–1169.

Supreme Court of Minnesota.

Aug. 31, 1990.

Rehearing Denied Oct. 8, 1990.

Hubert H. Humphrey, III, Atty. Gen., William F. Klumpp, Jr., Asst. Atty. Gen., St. Paul, and Stephen C. Rathke, Crow Wing County Atty., Brainerd, for appellant.

Robert W. Owens, Jr., Heuer & Associates, Minneapolis, for Jeffrey Buswell.

Steven J. Meshbesher, John J. Leunig, Meshbesher, Birrell & Dunlap, Minneapolis, for Gary Schwartzmann.

Richard D. Genty, Winsted, for Dale Schmidt.

KELLEY, Justice.

Resolution of this case requires that we examine the extent to which searches of motor vehicles that turn up contraband seized by private security guards, who later turn the contraband over to government authorities for use in criminal prosecutions, constitute governmental actions subject to the limitations on unreasonable search and seizure of the Fourth Amendment to the United States Constitution. In denying the respondents' motions to suppress the contraband seized by private security guards, the trial court ruled that, on the facts of these cases, the search and seizure of the contraband was the product of a private search and, therefore, not subject to Fourth Amendment constraints against unreasonable searches and seizures. The court of appeals disagreed. It held that there was sufficient governmental involvement in the search to transform it into government action, and remanded the case to the trial court for determination of whether the searches were reasonable. *State v. Buswell,* 449 N.W.2d 471 (Minn. App.1989).

Because the determination of whether sufficient governmental involvement exists to transform a private search into governmental action is a question of fact to be determined by the trial court, *United States v. Koenig,* 856 F.2d 843, 847 (7th Cir.1988); *United States v. Walther,* 652 F.2d 788, 791 (9th Cir.1981), and because we are unable to conclude that the trial court's holding that each of the searches here was private was clearly erroneous, we reverse the court of appeals, reinstate the trial court's orders refusing to suppress the evidence, and affirm the convictions of these respondents.

The Brainerd International Raceway (BIR) operates an automobile racetrack on private property approximately six miles outside the City of Brainerd in Crow Wing County, Minnesota. The BIR was not within the jurisdiction of the City of Brainerd. In 1988 BIR contracted for security services at the track during the summer racing season with a company called North Country Security. Keith Emerson, whose primary employment was as a member of the City of Brainerd police force, owned and operated North Country Security. At the time, all City of Brainerd police officers, including Emerson, held appointments as special deputies for Crow Wing County. However, none of the Brainerd police officers, including Emerson, had independent powers of arrest outside the city limits of Brainerd except as directed by the Crow Wing County Sheriff or by a regularly deputized sheriff.

In 1988 North Country Security's contract with BIR called for North Country Security to be paid a set figure for security on a given race weekend. In return, it was North Country Security's responsibility to hire guards and manage all security arrangements at the track during a race meet. The weekend commencing August 18, 1988, was the largest weekend of that year's racing season; approximately 78,000 persons attended the raceway between Thursday and Sunday. North Country Security employed 127 guards, only six or seven of whom were licensed police officers employed in any governmental jurisdiction, to provide security during this meet. None of the off-duty police officers employed that weekend were from law enforcement agencies having any jurisdiction covering the Brainerd International Raceway.

In May 1988, before the commencement of BIR's 1988 racing season, Emerson had conferred in general terms with the Crow Wing County Sheriff and the local Minnesota Bureau of Criminal Apprehension agent relative to procedures to be employed for making arrests should security guards of North Country Security uncover illegal activity during a race meet. This conference resulted in agreement that if any incident encountered by North Country Security guards seemed to warrant an arrest for a crime, Emerson would first be notified, and, he, in turn, would decide whether to call in official law enforcement agencies. The arrangement was strictly procedural. No agreement was made relating to the type or number of searches by security personnel, nor were any official law enforcement personnel assigned to be present at the BIR during a race meet. However, if Emerson decided to report discovered criminal activity, a specific deputy or agent was "on call" to respond to the report.

Part of the responsibility of North Country Security on a race weekend was to see that only ticket holders entered the raceway grounds. North Country Security attempted to discharge that duty generally, and specifically on the weekend of August 18, 1988, by randomly stopping and searching vehicles seeking entry to the raceway to look for "stowaways."

After the gates were opened on August 18, 1988, a number of vehicles, including those operated by these respondents, were searched by security guards before being permitted to enter the grounds. The primary motivation for the searches was to insure that persons without admission tickets not enter the track; a secondary reason was to prevent illegal drugs from entering the premises, and to keep other contraband such as mopeds and fireworks out of the race track grounds.[1] No written warning was given to entrants that their vehicles might be searched for "stowaways" or illegal drugs, firecrackers or other prohibited items. However, Emerson had established a policy for North Country Security employees that before a search took place, occupants of vehicles were to be provided an option to refuse to consent to a search and not enter the track premises.

Security guard Bruce Gateley, who was not an off-duty public police officer licensed or employed as a law enforcement officer in any jurisdiction, actually conducted the searches of the vehicles occupied by the respondents. At the time of the search of each vehicle he was wearing North Country Security standard uniform and was carrying a sidearm and handcuffs. Before making each search, however, contrary to the policy established by Emerson, Gateley failed to secure consent to the search or inform the occupants of the option to refuse.

---

1. Crowd and patron conduct is difficult to control during a race of this magnitude, involving tens of thousand of patrons and extending over several days. In authorizing searches for illegal drugs, mopeds and fireworks, BIR hoped to minimize incidents that might result in damage to patrons or property. Although not specifically involving illegal drugs, fireworks, or small motorized vehicles, the "flavor" of the type of conduct some patrons engage in after overuse of mood altering substances (there alcohol), thereby endangering not only themselves, but, as well, other patrons, is presented in *Rieger v. Zackoski,* 321 N.W.2d 16 (Minn.1982). *See also State v. Borden,* 455 N.W.2d 482 (Minn.App. 1990).

On August 18, 1988, his procedure was to inform the occupants of each vehicle that the purpose of a search was to spot "stowaways," after which he proceeded to search the inside of the vehicle. This procedure was followed when he searched Respondent Schmidt's pick-up camper. After entering the camper, Gateley found no "stowaways," but did open a small closet in which a fishing tackle box which contained what appeared to be cocaine was located. Thereupon Gateley handcuffed Schmidt to a fence, and contacted Emerson, who himself notified law enforcement officers pursuant to the protocol previously established in May of 1988.

Using the same procedure, Gateley later stopped and searched a converted Greyhound bus occupied by Respondents Buswell and Schwartzman. While searching the bus for nonpaying persons, Gateley found cocaine, marijuana, and other drug paraphernalia in one of the closets. Both Schwartzman and Buswell were likewise handcuffed to the fence, and Emerson was again contacted so he could inform law enforcement officials of the situation.

The law enforcement official notified by Emerson was Crow Wing County Deputy Sheriff Bjerga, who, with other officers, responded by going to the race track. After further investigation they arrested all three respondents and charged them with possession of controlled substances.

After the trial court had denied the respondents' motions to suppress the drugs seized in the search, the parties by agreement submitted the cases to the trial court on stipulated facts. The respondents were adjudged to be guilty and subsequently sentenced. This appeal followed.

The limited issue presented by this appeal is whether the trial court's ruling that the searches were not governmental actions subject to the constraints of the Fourth Amendment to the United States Constitution was clearly erroneous.

Before addressing that issue, however, we deem it appropriate to note and briefly discuss a related but nondeterminative issue; to wit, whether the conduct of Gateley, had he been a governmental law enforcement official at the time, would have violated the "unreasonable searches and seizures" clause of the Fourth Amendment, thereby rendering the contraband seized subject to suppression. We have not the slightest doubt that these searches, which can charitably be characterized as being "outrageous," would violate the Fourth Amendment and result in suppression had they been made by one exercising governmental action. See, Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961); see also State v. Mitchell, 285 Minn. 153, 172 N.W.2d 66, 73 (1969) (marijuana seized by police subsequent to a warrantless, unconstitutional search of an entire house was suppressed). Indeed, the state concedes that if the searches by Gateley constituted state action, the Fourth Amendment rights of these respondents were violated.[2]

■ However, no matter how egregious the conduct of Gateley in making these searches, the contraband was properly admitted into evidence if, at the time, he enjoyed the status of a private citizen. The Fourth Amendment was intended as a restraint upon the activities of the government. It was never intended to be a limitation upon other than governmental agencies. Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921). Thus, a private search, even if unreason-

**2.** Originally the state took the position (1) that each respondent had consented to the search made, and (2) that Gateley found the illegal contraband in plain view during each search. Both arguments were patently meritless—and the latter was absolutely opprobrious. The evidence revealed that under the guise of looking for "stowaways," Gateley *opened* a small closet of Schmidt's camper and saw a closed fishing tackle box which, when opened, contained the drugs found. Similarly, during a search of a small closet in the bus, Gateley found drugs and drug paraphernalia. It would have been obvious to anyone that neither closet (or the tackle box) could hide a "stowaway," moped, or any other sizable items that the BIR had an interest in excluding from the track premises. Later, at oral argument the state altered its position, and conceded that if the searches constituted state action, suppression of the contraband would have been proper under the exclusionary rules.

able, will not result in evidence seized being suppressed because there is no constitutional violation. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *United States v. Pryba*, 502 F.2d 391, 397–398, n. 39, 40, 42 (D.C.Cir.1974).[3]

■ However, the mere fact that a private individual made the search and seized the contraband does not always isolate his or her conduct from Fourth Amendment scrutiny. If, "in the light of all the circumstances of the case" the private individual "must be regarded as having acted as an instrument or agent of the state" when conducting the search, the search is subject to Fourth Amendment constraints. *Skinner v. Railway Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989); *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971). The determination of whether the private person acted as an agent of the state is one of fact to be decided on a case-by-case basis after consideration of all the facts and circumstances relative to the search. *Skinner v. United States*, 489 U.S. at ——, 109 S.Ct. at 1411; *United States v. Koenig*, 856 F.2d 843 (7th Cir.1988); *United States v. Walther*, 652 F.2d 788, 791 (9th Cir.1981). "Whether a private party should be deemed an agent or instrument of the government for Fourth Amendment purposes necessarily turns on the degree of the government's participation in the private party's activities." *Skinner*, 489 U.S. at ——, 109 S.Ct. at 1411.

Federal courts have considered a variety of factors to determine whether government participation recasts the private individual as an instrument or agent of the state. In *United States v. Walther*, 652 F.2d 788 (9th Cir.1981), the Ninth Circuit stressed two "critical factors": (1) whether the government knew of and acquiesced in the search and (2) whether the search was conducted to assist law enforcement efforts or to further the private party's own ends. *Walther*, 652 F.2d at 792. Other circuits have adopted the *Walther* critical factor analysis either in whole or in part. *See, e.g., United States v. Pierce*, 893 F.2d 669, 673 (5th Cir.1990); *Pleasant v. Lovell*, 876 F.2d 787, 797 (10th Cir.1989); *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir.1987).[4]

These *Walther* criteria, as well as criteria suggested by other cases, are helpful in that they direct the trial court to focus on the significance and impact of the government's involvement in the search. The concern is whether the conduct of the government was such as to make the actions of a private individual the government's actions for the purpose of a Fourth Amendment analysis. Although the criteria set forth in *Walther* are helpful, the diversity in factual settings involving private searches mandates an individual case-by-case analysis in which precedent plays but a small part. As previously noted, final determination of whether the government's involvement was such as to transform a private search into a governmental search subject to the constraints of the Fourth Amendment is a question of fact to be resolved by the trial court. Moreover, such factual determinations will be reversed only if clearly erroneous. *United States v. Walther*, 652 F.2d

---

**3.** Our analysis today is limited to the public-private search dichotomy which, as indicated in the cases cited in the body of the opinion, arises from the Fourth Amendment to the United States Constitution. We do not reach the issue of whether this search violated Art. I, § 10 of the Minnesota Constitution. That issue has neither been raised nor discussed on appeal, and at the trial court level, at least one respondent failed to move that the evidence be suppressed under the Minnesota Constitution. We note, however, that Art. I, § 10 of the Minnesota Constitution like its federal counterpart, the Fourth Amendment, purports to constrain only unreasonable searches by governmental authority.

**4.** In *United States v. Luciow*, 518 F.2d 298 (8th Cir.1975), the Eighth Circuit seemingly stressed a different factor, to wit, that before a private individual's action can be attributed to the government, some degree of government instigation of the search must be shown. *Id.* at 300 (*citing United States v. Valen*, 479 F.2d 467 (3rd Cir.1973), *cert. denied* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974)). *See also United States v. Coleman*, 628 F.2d 961, 965 (6th Cir.1980) (police did not *instigate,* encourage, or participate in search).

788 (1981) (dictum); *United States v. Botero*, 589 F.2d 430, 433 (9th Cir.1978), *cert. denied* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979); *United States v. Koenig*, 856 F.2d 843, 849 (7th Cir.1988); *United States v. Feffer*, 831 F.2d 734 (7th Cir. 1987).

■ Respondents advance several arguments in support of their contention that Gateley and North Country Security were acting as instruments or agents of the state when the searches and seizures were made. We examine these arguments keeping in mind the two factor *Walther* test and watching for clear indices of significant government involvement which would convert the conduct of the BIR security force into government action. First, respondents contend that the May meeting between Emerson and Crow Wing County law enforcement officials at which arrest procedures were formulated indicates that the state knew of, ordered, encouraged, and acquiesced in the vehicle searches by North County Security guards, and, therefore, the guards were instruments or agents of the government. In advancing this argument, respondents rely, in part, upon *Walther*, 652 F.2d 788, where the court concluded that an airline employee who had seized an overnight case, found drugs upon opening it, and then contacted narcotic agents from the Drug Enforcement Agency, who then arrested the owner, was an instrument of the government. There, unlike the cases before us today, the airline employee had been a paid Drug Enforcement Agency informant for at least five years before the search and expected compensation for the search there at issue.

Contrasted to *Walther*, the facts surrounding the searches here differ dramatically. The records in these cases contain nothing to indicate that law enforcement officials did anything to persuade North Country Security employees to conduct searches in any particular manner, or to search for any particular items.[5] Law enforcement personnel did know that searches for stowaways would occur at entry gates. But, nothing in the record indicates that law enforcement officials knew the searches would violate BIR policy and be conducted without first obtaining the consent of the vehicle occupants. Furthermore, not only is the record devoid of evidence that law enforcement officials were aware of or encouraged the specific searches in question, but apparently, similar searches resulting in an arrest had not occurred during the 1988 racing season. The record contains not one reference to any search which occurred between the May meeting and the August 18, 1988 race at which Gateley, or any other officer searched for, found, or turned over contraband to law enforcement officials, or any evidence that he received, or even expected, compensation for so doing. In short, unlike *Walther*, there is no indication that Gateley or North County Security conducted the searches with the government's objectives in mind. The government in no way "knew of" or "acquiesced in" the search. *Walther*, 652 F.2d at 792.

■ Mere antecedent contact between law enforcement and a private party is inadequate to trigger the application of the exclusionary remedy under the Fourth Amendment. *United States v. Coleman*, 628 F.2d 961, 965 (6th Cir.1980). It is only when the government takes some type of initiative or steps to promote the search, that a private citizen is deemed to be an agent or instrument of the government. *Pleasant v. Lovell*, 876 F.2d 787, 796–97 (10th Cir.1989). But when the extent of governmental involvement amounts to no more than responding to requests for arrests and discussions concerning arrest procedure, the Fourth Amendment exclusionary sanctions are not triggered. *See, e.g., United States v. Koenig*, 856 F.2d 843 (7th Cir.1988); *United States v. Ramirez*,

---

**5.** The dissent suggests that at the May meeting Emerson and law enforcement officials "discussed the search and seizure of controlled substances at the gate of BIR." Dissent at D–2. This is somewhat misleading as nothing in the record indicates that searches and seizures of controlled substances at the main gate were specifically discussed. Rather, the group determined that for any incident, not only those dealing with controlled substances, Emerson would be the sole contact with both the Crow Wing County Sheriff's Office and the BCA.

810 F.2d 1338 (5th Cir.) *cert. denied,* 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987); *State v. Sanders,* 185 N.J.Super. 258, 448 A.2d 481 (App.Div.1982); *United States v. Capra,* 372 F.Supp. 609 (S.D.N.Y. 1974).

■ Respondents next focus upon the status of Emerson, whose primary employment was as a City of Brainerd police officer. They suggest that the government cannot avoid the constraints of the Fourth Amendment by directing a third party to perform an illegal search. *See, e.g., United States v. West,* 453 F.2d 1351, 1356 (3rd Cir.1972). This argument fails for two reasons. First, Emerson was not acting as a government agent; his duties at the BIR were not those of a government law enforcement agent. At the BIR he had only the power to make a citizen's arrest because he was outside the jurisdiction in which he had any authority as a licensed public officer. The two jobs were distinctly separated. *See, e.g., United States v. McGreevy,* 652 F.2d 849 (9th Cir.1981); *Commonwealth v. Leone,* 386 Mass. 329, 334–36, 435 N.E.2d 1036, 1048–41 (1982).

Furthermore, nothing in the records of these cases suggests that Emerson directed a third party, the security guards, to conduct searches without first asking consent of the vehicle occupants, or to exceed the scope of that consent given, or to look for contraband outside the area in plain view. To the contrary, the evidence indicates Emerson's policy was to ask vehicle occupants if guards could conduct a search, inform the occupants of the scope of the search, and inform the occupants that if the search was refused, the search would not be conducted and the vehicle occupants would be prevented from entering the raceway. In other words, no evidence points to Emerson as the original instigator of the searches. The evidence seems clear that it was the race track management who requested vehicle searches for nonpaying attenders, and for other items that might be used to disrupt the raceway weekend program. These facts support the trial court's implicit findings that there was no significant government involvement in these searches.

■ That being so, we could end our analysis at this point. However, we proceed to examine the trial court's findings that the searches were conducted by private persons and were for private rather than governmental purposes. This leads us to consider the second *Walther* factor— an analysis of the purpose of the search to see if the trial court's conclusion that it was private has support in the evidence, keeping in mind that searches conducted for private purposes which turn up evidence of crime do not turn into state action merely because that evidence is later turned over to law enforcement officials. *United States v. Bulgier,* 618 F.2d 472 (7th Cir.1980). The trial court found legitimate private purposes for the search. Without doubt there exists evidence to support that conclusion. The BIR primarily sought to prevent people for entering the raceway without first paying admission. Additionally, the BIR had legitimate private reasons to prevent illegal drugs, mopeds, and fireworks from entering the raceway in order to minimize disruptive behavior of patrons, to prevent injury to or discomfort of other patrons, and to reduce the possibility of destruction to property.

Accordingly, we are unable to conclude that the trial court arrived at a clearly erroneous finding when it found that the searches and seizures in this case were private and, thus, not subject to Fourth Amendment constraints.[6] Clearly, evi-

---

6. As did the court of appeals, we express our concern that egregious searches by private security guards escape the penalty of suppression, whereas similar conduct by licensed law enforcement officers would not. We take notice that private security guards often possess professional police knowledge and skill, and may conduct searches with the goal of obtaining evidence of crime. *See, e.g., State v. Keyser,* 117 N.H. 45, 47, 369 A.2d 224, 225 (1977). The court of appeals in its opinion addressed this concern by determining that private security guards may be subject to Fourth Amendment constraints when they regularly engage in the "public function" of law enforcement. *State v. Buswell,* 449 N.W.2d at 475. *See also People v. Holloway,* 82 Mich.App. 629, 635, 267 N.W.2d 454, 459–60 (Kaufman, J. concurring). It of-

dence existed to support that result. Therefore, we reverse the decision of the court of appeals, and the judgment of the trial court is reinstated.

YETKA, J., files dissenting opinion in which WAHL and KEITH, JJ., join.

YETKA, Justice (dissenting).

Because the security agents here worked as instruments or agents of the state and thus were governed by the fourth amendment's prohibition against unreasonable searches and seizures, I dissent.

The fourth amendment applies to searches and seizures effected by a private party acting "as an instrument or agent of the Government." *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989). The degree of government participation in the private party's activities sufficient to make the private party its instrument or agent is a question to be resolved "in light of all the circumstances." *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 2048, 29 L.Ed.2d 564 (1971). According to the Supreme Court, the fact that the government did not compel a private party to perform a search does not, by itself, establish that the search is a private one. *Skinner*, 109 S.Ct. at 1411. Rather, fourth amendment protection can apply where the government has done "more than adopt a passive position toward the underlying private conduct." *Id.*

In *Skinner*, federal regulations authorized, but did not compel, a private railroad to test employees to detect drug and alcohol use. The court found that, by removing legal barriers to testing, pre-empting collective bargaining agreements prohibiting testing, and indicating a strong preference for testing and a desire to share in the fruits of these intrusions, the government encouraged, endorsed and participated in the testing so as to implicate the fourth amendment. *Id.* at 1412.

Although there is no evidence that the county law enforcement officials compelled North Country Security to search vehicles, as in *Skinner*, they clearly adopted more than a passive position towards this conduct. At their meeting before the race season opened, Emerson, the owner and operator of North Country Security, and county law enforcement officials discussed the search and seizure of controlled substances at the gate of BIR. Emerson testified that the security guards agreed to contact him if they found contraband while searching vehicles for stowaways. Emerson would then call the county officials. They also agreed that the guards would hold persons possessing contraband until county officials arrived. An official was on call to make arrests if Emerson called. In short, the law enforcement officials here, like the government in *Skinner*, knew that private parties would be conducting searches and raised no legal barriers to these searches or to the prospect of private security guards forcibly holding people at the race track. Indeed, the county officials planned to use the fruits of those searches.

In *Skinner*, the Court discussed as a threshold matter whether the government endorsed searches and, after concluding that the fourth amendment applied, analyzed the validity of those searches. *Skinner*, 109 S.Ct. at 1411–22. The Court did not require the defendants to establish, as the majority suggests the defendants should here, that the government encouraged a particular manner of or objectives for searching people, nor does the Supreme Court require the government to provide incentives to private actors in order to implicate the fourth amendment. Establishing that the county officials knew that there would be security personnel at BIR searching vehicles and detaining people until they arrived is evidence that county officials acquiesced in the searches. This is official state action. Accordingly, I would

---

fends our sense of rationality and proportionality that a person who performs acts similar to a law enforcement official is able to circumvent the constraints of the fourth amendment merely because the private sector pays the bill. But, we

cannot ignore the clear line of precedents starting with *Burdeau v. McDowell* which hold that the fourth amendment only gives protection against unlawful government actions.

hold that the security company here acted as an agent of the state and that defendants are entitled to the protection of the fourth amendment.

This same result follows from applying the test set out in *United States v. Walther*, 652 F.2d 788 (9th Cir.1981), and adopted by the majority. Majority Op. at 618. Under this test, courts determine if a private party acts as an agent of the government by considering (1) whether the government knew of and acquiesced in the search and (2) whether the search was conducted to assist law enforcement efforts or to further the private party's own ends. *Id.* at 792. As discussed above, the government knew of and acquiesced in the searches here. The searches benefited the government as well as BIR. BIR could have fulfilled its security needs simply by denying admittance to the race track. Certainly assisting law enforcement is a commendable practice, but, in this case, it should be exercised within the restraints of the Constitution.

Emerson's status as an experienced police officer and special deputy for the Crow Wing County Sheriff's Department is not essential to finding state action. This fact does, however, lend additional weight to finding state involvement here. Emerson instructed Gately, a North Country security guard, to search every vehicle entering BIR during a 2–hour period the morning of the race. He was close enough to see Gately search defendants' vehicles and handcuff the defendants to a fence. Emerson's close contact with law enforcement officials as an employee raises the concern that his security agents, under his direction, conducted police work and circumvented the Constitution under the guise of private security work. Even though, as the majority notes, Emerson only had the power to make a citizen's arrest at the BIR, searches effected pursuant to that authority are not immune to fourth amendment scrutiny. *See State v. Schinzing*, 342 N.W.2d 105, 108–11 (Minn.1983); *State*

*v. Filipi*, 297 N.W.2d 275, 277–79 (Minn. 1980).

Significant policy considerations underlie this issue. I agree with the Supreme Court of California that "searches by private security forces can involve a particularly serious threat to privacy." *People v. Zelinski*, 24 Cal.3d 357, 365, 155 Cal.Rptr. 575, 579, 594 P.2d 1000, 1004 (1979). First, it seems to me incongruous to give private individuals who do not receive the equivalent training of official police forces broader authority to make searches and seizures than police officials themselves. Second, here, the security guards were clad in a police-like uniform, including a hat, badge, shoulder patches and belt with a flashlight. Gately also carried handcuffs and a sidearm. The security guards looked like and were acting like law enforcement officials. Private investigators and security guards who regularly engage in the "public function" of law enforcement should be subject to fourth amendment constraints. *See Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company-owned town acting in a public function subject to first amendment constraints); 1 W. LaFave, *Search and Seizure* § 1.8(d) at 200 (2d ed. 1987).

In general, it is important to note that the Constitution itself would not have been ratified if the original drafters had not promised to write the Bill of Rights. The colonists took the language in our Bill of Rights from a 700–year history of English law and were determined to put in writing fundamental rights upon which the government cannot infringe. They did not intend to leave these fundamental rights to chance, interpretation or an unwritten constitution such as the British still have. I am concerned that the majority opinion, in effect, waters down the Bill of Rights. The Bill of Rights should be changed by amending the Constitution itself, not by judicial interpretation.

As the majority acknowledges, the action taken by the security agents in searching the vehicles would undoubtedly violate the fourth amendment to the United States Constitution if performed by law enforce-

ment officials. Majority Op. at 617–618. Because I would find that North Country Security acted as an agent of Crow County law enforcement officials, I would affirm the court of appeals.

WAHL, Justice (dissenting).

I join the dissent of Justice Yetka.

KEITH, Justice (dissenting).

I join the dissent of Justice Yetka.