STATE of Minnesota, Respondent,

v.

Craig Robert LICARI, Petitioner,
Appellant.

No. C2–01–290.

Supreme Court of Minnesota.

April 17, 2003.

John M. Stuart, State Public Defender, Michael F. Cromet, Asst. Public Defender, attorneys for Craig Robert Licari, appellant.

Mike Hatch, Atty. Gen., Thomas R. Ragatz, Asst. Atty. Gen., Jeffrey R. Edblad, Isanti County Atty., attorneys for State of Minnesota.

## OPINION

HANSON, Justice.

Appellant Craig Robert Licari (appellant) was charged with one count of second-degree intentional murder in connection with the death of his wife, Nancy Licari. Police discovered much of the evidence upon which appellant was convicted during a warrantless search of a storage unit rented by appellant. Appellant challenged the constitutionality of the search of the storage unit. The district court denied his motion to suppress, finding that the manager of the storage unit had actual authority to consent to the search. After a court trial on stipulated evidence, the district court found appellant guilty and sentenced him to 330 months in prison. The court of appeals affirmed on other grounds, holding that the manager did not have actual authority to consent to the search but that the investigating officer reasonably relied upon the apparent authority of the manager to consent to the search. *See State v. Licari,* No. C2-01-290, 2002 WL 4574, at *4-5 (Minn.App. Jan.2, 2002). We affirm in part, reverse in part and remand to the district court for further proceedings.

### A. Missing Persons Report

On Saturday, April 24, 1999, Janet Hennes called the Isanti County sheriff's office to report that her sister, Nancy Licari, was missing. Deputy Sheriff Jim Johnson responded to Hennes's call and also talked to Nancy's mother, Kathleen Smith. Smith told Johnson that Nancy had not returned from a dinner meeting with appellant; her estranged husband, the previous evening; that Nancy had driven Smith's Ford Tempo to the meeting; and that Smith had expected Nancy to return in just a few hours.

The next day, Nancy's family reported that they had found a letter written by appellant that hinted strongly that he was suicidal. Isanti County Investigator Kory Erickson, Bureau of Criminal Apprehension (BCA) Special Agent Jon Hermann and other officers swept the vicinity of the cafe at which appellant and Nancy reportedly had met on April 23, but they did not find appellant, Nancy or their automobiles. On Monday, April 26, Erickson and Hermann obtained information about Nancy's credit cards, which they used to try to locate her. Erickson then put out a Minnesota Crime Alert notification to local bars, restaurants and motels, requesting that anyone who had seen the missing persons or their cars call 911.

Nancy's relatives and appellant's sister also told Investigator Erickson that appellant and Nancy were renting a storage unit at Big Closet Mini Storage (Big Closet), south of Isanti. Nancy's family told Erickson that Nancy made the payments on the unit, kept personal belongings in the unit, and usually held the key to the unit. The family did not have the key to the unit at that time; they told Erickson that Nancy had recently given the key to appellant. Erickson enlisted Isanti County Investigator Michael Ammend to check out the storage unit, telling him that the family had given Erickson permission to look inside the storage unit.

## B. Storage Unit Search

On the afternoon of Tuesday, April 27, Ammend met with Karen Eaves and learned that she was the manager of Big Closet. Eaves told Ammend that Nancy and appellant had rented a storage unit at Big Closet, that Eaves had a key to the unit, and that appellant was "the sole person on the lease." According to Ammend's testimony, "[Eaves] stated something about it's on the contract where they have a right to go into the storage shed whenever they—whenever they want, I guess, is the way—I don't remember her exact words, but that was the gist of it." Eaves then led Ammend to the storage unit. Ammend later testified that he hoped to find something in the storage unit "to indicate where [Nancy and appellant] might have been or have gone;" he did not feel that he was investigating a crime but rather was performing a "cursory search for the family." However, the Minnesota Crime Alert notification had warned that "[s]uspect [appellant] wrote note with [s]uicide & death!!!"

Eaves unlocked the outer gate surrounding the facility and then removed the lock from the door to appellant's unit. While still standing outside, Ammend opened the garage-style door to the unit and looked inside. On the floor of the storage unit, Ammend saw a blue object that he recognized as either a blanket or a sleeping bag. Next to the blue object was a pillow with a "reddish-brown substance on it." Upon seeing this substance, Ammend stepped into the unit to see what was under the pillow. From a vantage point "two or three steps" inside the unit, he saw "what appeared to be the top of a head which had hair and [a] lot of reddish-brown substance on the head." Ammend concluded that the reddish-brown substance was blood.

Ammend testified that he immediately exited the unit "at that point [because] it appeared to be a crime scene." He told Eaves to leave and then secured the unit with crime scene tape. Next, Ammend notified Investigator Erickson and Special Agent Hermann of what he had found. Upon arriving at the scene, Hermann stepped into the unit to confirm that the person inside was in fact dead. Aside from these intrusions by Hermann and Ammend, no one entered the unit until Erickson and another investigator obtained a search warrant. The affidavit supporting the warrant summarized the investigation to this point, including the discovery of a body in the storage unit.

When Isanti County and state BCA officers later entered the storage unit with the warrant, they determined the body was that of Nancy Licari. She had been severely beaten about the face. They also found a baseball bat with Nancy's blood on it and a tennis shoe print in the victim's blood.

## C. The Arrest

On Wednesday, April 28, investigators traveled to Minneapolis after learning that someone had been using Nancy's credit

cards to buy jewelry and videocassette recorders at two Target stores in Minneapolis. They met with security personnel at the stores and requested documentation of those transactions. The Target personnel told police that a man had caused a problem at Target because he was trying to buy jewelry with a card that had Nancy's name on it. The investigators left behind a photo of appellant and asked Target staff to assist the police in locating him.

Agent Hermann testified that he then visited a nearby pawnshop and acquired records showing that appellant had pawned a videocassette recorder there. Investigators also learned that a car matching the description of Kathleen Smith's Ford Tempo had been seen parked on a street in south Minneapolis.

Finally, a manager from one of the Target stores they had visited contacted the investigators to announce that store security had apprehended and were detaining appellant. The apprehension and detention was executed by an off-duty Minneapolis police officer who had seen the information on appellant (including a photograph) left behind by the investigators. The officer acknowledged that he had no other grounds to arrest appellant because appellant was not committing any crime in Target; he testified that he made the arrest based on the "probable cause pick-up" request left by the BCA. The officer searched appellant and found he was carrying the keys to the Big Closet storage unit, as well as Nancy's credit cards. The hat and clothing appellant was wearing were stained with blood.

When investigators searched the Ford Tempo, they discovered a purse, a wallet, a driver's license and a jacket belonging to Nancy. They also found a partial package of "Swisher Sweets;" crime scene investigators had found the same cigars at the storage unit.

### D. Additional Investigation

After the arrest, investigators reviewed computer records from the Big Closet security system which showed that appellant had entered and exited the storage facility on April 23. The investigators also confirmed that the blood on appellant's clothes matched Nancy's blood, appellant's fingerprints matched those found on the bat, and one of the shoes appellant was wearing matched the shoe print found in the storage unit.

Some time after the arrest, the Isanti investigators acquired surveillance videotape and sales records from the Target stores and the pawnshop, which showed appellant buying videocassette recorders at the stores and pawning them at the pawnshop.

On May 3, investigators obtained a copy of the rental agreement for the Big Closet unit. The agreement provided, in pertinent part:

> **Relocation.** Lessor reserves the right to relocate Lessee, without expense to Lessee, to any compartment of comparable size.
>
> **Access to Premises.** Lessor and its employees and agents shall have the right to enter the premises at all reasonable times for the purpose of inspection, cleaning, repairing, altering or improving the premises or the building; however, Lessor shall not thereby unreasonably interfere with Lessee's use of said premises.

### E. Procedural History

Appellant was charged with second-degree intentional murder. He filed suppression and dismissal motions challenging the constitutionality of the search of the storage unit. The district court denied

appellant's motions, reasoning that because the rental agreement gave Big Closet manager Eaves the right to enter the storage unit for purposes of "inspection," she had the actual authority to consent to Investigator Ammend's search of the unit. Further, the court held that Ammend's observation through the open door of blood on the pillow fit the plain view exception to the warrant requirement. After appellant consented to a court trial on stipulated evidence, the district court found him guilty of second-degree murder. Appellant does not challenge the sufficiency of the evidence.

Before the court of appeals, the state advanced five alternative arguments in support of the district court's denial of the motion to suppress: (1) appellant had no reasonable expectation of privacy in the storage unit; (2) the storage facility manager had actual authority to consent to a search of the unit; (3) the storage facility manager had apparent authority to consent to a search of the unit; (4) there were exigent circumstances justifying the officer's entrance into the unit; and (5) the inevitable discovery exception to the warrant requirement applied. *Licari*, 2002 WL 4574 at *3–7.[1] The court of appeals rejected all of the state's arguments except that based on apparent authority. The court held that because "Ammend acted on the manager's affirmative and unambiguous statement of fact that she was authorized under the rental agreement to enter the unit at will," Ammend's factual mistake regarding Eaves' actual authority was reasonable and his warrantless entry was permissible under the rule of *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). *See Licari*, 2002 WL 4574 at *5.

We granted appellant's petition for review of the decision of the court of appeals.

## I.

 The state challenges appellant's capacity to allege that his constitutional rights were violated, on the grounds that he had no reasonable expectation of privacy in the storage unit. In order to contest a search of his property, a defendant must establish a "legitimate expectation of privacy relating to the area searched or the item[s] seized." *State v. Richards*, 552 N.W.2d 197, 204 (Minn.1996). Legitimate expectations of privacy are those expectations permitted and recognized as reasonable by society. *See Rakas v. Illinois*, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The state argues that four facts eliminate appellant's reasonable expectation of privacy in the storage unit: first, appellant did not have exclusive use of the unit because his estranged wife frequently used it; second, the rental agreement gave Big Closet the right to enter for what the state terms "broad purposes;" third, the storage unit was commercial property, rather than residential property; and fourth, appellant left his wife's body "uncovered" in the middle of the storage unit, where anyone who opened the door to the unit would immediately see it. At oral argument, the state conceded that any one of these factors, standing alone, would not suffice to defeat appellant's reasonable expectation of privacy in the storage unit. But the state argues that, added together, these facts destroy any such expectation.

 We cannot accept the state's argument. While sharing property with another person exposes an owner to the risk

1. The state did not argue that the consent to search obtained from Nancy Licari's family was effective or that the administrative nature of the investigation, seeking information on a missing person, justified a warrantless search.

that the other tenant may consent to a police search, *see United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), such sharing does not lessen the owner's reasonable expectation of privacy as to third persons, including the landlord. Moreover, in *State v. Hodges*, 287 N.W.2d 413, 415 (Minn.1979), we held that a renter of a storage unit had a reasonable expectation of privacy. As noted below, the lease language here is no broader than it was in that case. We hold that appellant had a reasonable expectation of privacy in the storage unit and that he has the capacity to challenge the constitutionality of the search of the unit based upon the consent of the facility manager.

## II.

■ When this court reviews the legality of a search, it will not reverse the district court's findings unless they are "clearly erroneous or contrary to law." *State v. Munson*, 594 N.W.2d 128, 135 (Minn.1999).

■ The Minnesota and United States Constitutions both protect against unreasonable searches and seizures by state authorities. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Warrantless searches are presumptively unreasonable unless one of "a few specifically established and well-delineated exceptions" applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The state bears the burden of establishing the applicability of an exception. *State v. Ture*, 632 N.W.2d 621, 627 (Minn.2001).

The district court held that the search of the storage unit was lawful because of manager Eaves' actual authority to consent. The state presents three additional exceptions to the warrant requirement: apparent authority to consent, plain view and inevitable discovery. We will address each of these in turn.

### A. Actual Authority

■ The district court concluded that Eaves had actual authority to consent to the search of the storage unit. The state does not explicitly argue before us that Eaves had actual authority, but neither does it concede this issue. The issue also has relevance to the issue of apparent authority because apparent authority exists only if the authority claimed by the third party would, if true, be sufficient to satisfy the legal test for actual authority. *See Illinois v. Rodriguez*, 497 U.S. at 188–89, 110 S.Ct. 2793; *United States v. Whitfield*, 939 F.2d 1071, 1073–74 (D.C.Cir. 1991). The precise question is whether actual authority can be based solely on rights of *access* or requires, in addition, some rights of *use*.

The United States Supreme Court has held that a third party has actual authority to consent to a search if she "possess[es] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171, 94 S.Ct. 988. The *Matlock* Court described "common authority" as follows:

Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on *mutual use* of the property by persons generally having *joint access or control for most purposes*, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. 988 (emphasis added) (citations omitted). In *State v. Buschkopf,* we said, in applying *Matlock,* that "a finding of 'mutual use' is the essential ingredient of effective consent." 373 N.W.2d 756, 767 (Minn.1985), *abrogated on other grounds by Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

 Generally, a landlord is not seen as having actual authority to consent to a warrantless police search of the premises occupied by a tenant. *Hodges,* 287 N.W.2d at 415. This is because a landlord, though she might reserve rights of access, typically does not have rights of use. Thus, a landlord lacks actual authority even when she has "'by express agreement or by implication reserved the right to enter for some special and limited purpose.'" *Id.* (quoting 2 Wayne R. LaFave, *Search and Seizure* § 8.5(a) at 739 (1978)). In fact, in *Richards,* we made the absolute statement: "But, a landlord may not grant police [permission to search] unless the tenant has abandoned the property." 552 N.W.2d at 203–04 n. 2.

The access rights reserved by Big Closet under appellant's rental agreement are no broader than those reserved by the landlord in *Hodges.* In *Hodges,* this court held that the landlord did not have actual authority to consent to a police search even though the landlord had reserved "the right to enter the premises at any reasonable time to view the premises, to make repairs, or to show them to other prospective tenants." 287 N.W.2d at 414. While appellant's rental agreement explicitly provided the landlord with the right of access for "inspection," it would be difficult to interpret that term to be broader than "view the premises," as in *Hodges.* In either case, the landlord's right of access is restricted to a "special or limited purpose" (i.e., to inspect or to view), and such right of access does not, by itself, constitute "use."

Some federal circuits put less emphasis on mutual use in applying the *Matlock* test and suggest that joint access is sufficient.[2] These holdings draw support from the statement in *Matlock* that authority to consent rests on "common authority over *or other sufficient relationship to"* the area or articles searched. 415 U.S. at 171, 94 S.Ct. 988 (emphasis added). But these cases conflict with Minnesota case law holding that mutual use is essential and with federal circuits that have required more than joint or general access to satisfy the *Matlock* standard. For example, in *Whitfield,* the D.C. Circuit determined that a mother's "joint access" to her son's room was insufficient to satisfy *Matlock* where there was no evidence that she had "mutual use" of the room. 939 F.2d at 1074–75.[3]

---

**2.** *See, e.g., United States v. Hall,* 979 F.2d 77, 79 (6th Cir.1992) (holding a landlord had common authority over his tenant's rented room where the landlord provided the furniture and accessed his own storage area through the rented room); *United States v. Block,* 590 F.2d 535, 539–41 (4th Cir.1978) (extending *Matlock* to cover a mother who had "common authority over, general access to, or mutual use of" a room in her house used by her son); *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir.1974) (upholding consent by third party who was given possession of defendant's car and had "access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access").

**3.** *See also United States v. Morales,* 861 F.2d 396, 399 (3d Cir.1988) ("Authority to consent to a search arises from mutual use of the property by persons generally having joint access or control for most purposes."); *Petersen v. People,* 939 P.2d 824, 832 (Colo.1997) (holding that a "caretaker with limited duties" does not have sufficient "use and control" of the premises to consent to a search). In addition, in *Illinois v. Rodriguez,* discussed

Moreover, the conflict in the federal cases can be somewhat explained by recognizing a distinction between the status of a landlord and that of a co-inhabitant of the premises. The federal courts have clearly been more reluctant to find authority to consent for the former than the latter—and a co-inhabitant is more likely than a landlord to have mutual use in addition to joint access. Notably, the one case that concluded that a landlord had actual authority to consent, *United States v. Hall*, involved a landlord who was also a co-inhabitant of the same home, who owned the furniture in the rented room and who used the rented room as a route to his own storage space. 979 F.2d 77, 79 (6th Cir. 1992). The state has cited no case that finds actual authority to consent by a landlord based solely upon broad rights of access reserved in a lease. *See generally* 3 Wayne R. LaFave, *Search and Seizure* § 8.5(a) n. 11 (3d ed.1996) (citing landlord cases, none of which found actual authority to consent).

To the extent that appellant's lease granted Big Closet and its manager rights of access, we hold that manager Eaves did not have actual authority to consent to the search of appellant's storage unit.

As noted above, appellant's rental agreement also provided the landlord with the right to relocate appellant to another comparable unit. Neither party has referred to this provision at any stage in this proceeding. No evidence was offered as to its intent or how it operated in practice. If this clause contemplated that the landlord would only give notice to the tenant and reimburse the tenant for the tenant's relocation costs, it likely would not add rights of "use" to the landlord's rights of inspec-

tion. If it meant that the landlord could enter appellant's unit and unilaterally move the contents to another unit, it would add rights of "use" that would impact on the question of actual authority. We address this question further in Section III below.

### B. Apparent Authority

■ The state argues that Ammend reasonably relied on manager Eaves' apparent authority to consent to the search of the storage unit based on her statement that she had the right to go into the storage unit whenever she wanted. Under some circumstances, police may rely on the consent to search given by a third party who has no actual authority over the premises searched. Two United States Supreme Court cases set the boundaries of the apparent-authority doctrine.

In *Stoner v. California*, the Supreme Court held that the police could not validly rely on a hotel clerk's consent to search a room rented and exclusively occupied by the petitioner. 376 U.S. 483, 488–89, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). The *Stoner* Court noted that "there is nothing in the record to indicate that the police had any basis whatsoever to believe that the night clerk had been authorized by the petitioner to permit the police to search the petitioner's room." *Id.* at 489, 84 S.Ct. 889.

Twenty-six years later, in *Illinois v. Rodriguez*, the Supreme Court addressed a case in which the defendant's former girlfriend gave police permission to enter an apartment rented by the defendant. 497 U.S. at 179–80, 110 S.Ct. 2793. The woman let police in with a key, referred to the apartment as "our" apartment and told

below, the United States Supreme Court found that there was no actual authority because the consenting third party did not have "joint access or control for most purposes" of

the searched apartment. 497 U.S. 177, 181–82, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (quoting *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988).

police that she owned clothes and furniture there. *Id.* at 179, 110 S.Ct. 2793. The Court concluded that the woman lacked actual authority, because she had in fact moved out about one month before and only returned when she was invited. *Id.* at 181, 110 S.Ct. 2793. But the Court upheld the resulting seizure of drugs, formulating the following test for apparent authority:

> [D]etermination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?

*Id.* at 188, 110 S.Ct. 2793 (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotation marks and ellipsis omitted).[4]

We have adopted the *Rodriguez* "objective standard" for determining apparent authority. *See State v. Thompson*, 578 N.W.2d 734, 740 (Minn.1998) ("Where common authority does not actually exist, consent to entry is still valid where, under an objective standard, an officer reasonably believes the third party has authority over the premises and could give consent to enter.").

■ Subsequent federal circuit decisions have held that the *Rodriguez* apparent authority doctrine can apply only when

investigators make mistakes of fact, as distinguished from mistakes of law. *See, e.g., Whitfield*, 939 F.2d at 1073–74. In *Whitfield*, the D.C. Circuit addressed a case where a homeowner consented to a police search of her adult son's room in her house. *Id.* at 1072–73. Investigators testified that they understood the mother owned the house, her son's room was left unlocked, and she had "free access" to the room. *Id.* The D.C. Circuit held that *Rodriguez* only "applies to situations in which an officer would have had valid consent to search if the facts were as he reasonably believed them to be." *Id.* at 1074. The court concluded that the mother's assertions, even if true, were not sufficient to establish "mutual use" under the *Matlock* standard, and thus they did not give her apparent authority to consent. *Id.* Stated another way, if the facts possessed by police would not establish actual authority to consent under the law, police reliance on those facts cannot be reasonable.

Other decisions have followed *Whitfield* and held searches unlawful under the *Rodriguez* and *Matlock* standards where assurances police received, even if true, would fail to establish "mutual use."[5]

■ Appellant argues that Investigator Ammend's mistake in this case was a mistake of law because even if Ammend was reasonable in believing that manager Eaves could go into appellant's storage

---

4. The *Rodriguez* Court construed *Stoner* to hold that the police in *Stoner* "could not reasonably have believed" that the hotel clerk had the authority to consent to a search of petitioner's hotel room. *Rodriguez*, 497 U.S. at 188, 110 S.Ct. 2793.

5. *See, e.g., United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir.1992) (concluding that officer's belief that landlady authorized to enter apartment to turn off electrical appliances or lights could consent to a search of apartment was mistake of law); *United States v. Salinas–Cano*, 959 F.2d 861, 865–66 (10th Cir.1992)

(concluding that officer's belief that apartment tenant could consent to search of other party's suitcase left in tenant's apartment was mistake of law); *see also* 1 LaFave, *supra.,* § 8.3(g). At least one court has construed *Stoner* to be just such a "mistake of law" case. *See Petersen*, 939 P.2d at 831. *See also State v. Frank*, 650 N.W.2d 213, 219 (Minn.App. 2002) (concluding that officer's belief that driver of vehicle could consent to search of suitcases found in vehicle was mistake of law).

unit whenever she wanted, that belief would not be sufficient for apparent authority because manager Eaves' statement did not establish mutual use under *Matlock.* We agree.

While searches based on honest, reasonable mistakes of fact are unobjectionable under the Fourth Amendment, a police officer's mistake of search and seizure law (here, a mistake as to the legal requirements for the authority of a landlord to consent to a search) cannot be reasonable. "Otherwise, the protections of the Fourth Amendment would be effectively limited to what the average police officer believed was reasonable." *Petersen v. People,* 939 P.2d 824, 831 (Colo.1997). Because manager Eaves asserted only rights of access and did not claim to have mutual use, Investigator Ammend's objective belief that manager Eaves had the authority to consent to a search was not reasonable. *See Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793; *Thompson,* 578 N.W.2d at 740. We therefore hold that the search of appellant's storage unit does not fit the apparent authority exception to the warrant requirement.

### C. Plain View

The state argues that because Investigator Ammend made his initial observation of the "reddish-brown substance" from outside of the storage unit, the search fits the plain view exception to the warrant requirement. The plain view exception to the warrant requirement contemplates that the police are lawfully in a place that produces plain view of an incriminating article. *Horton v. California,* 496 U.S. 128, 135, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). When police have made an initial intrusion into a place and that intrusion is not justified by one of the recognized exceptions to the warrant requirement, the seizure of objects in plain view from that place is likewise invalidated by the unlawful intrusion. *See id.* In this case, it was the opening of the unit door that required justification; neither plain view nor exigent circumstances authorized Ammend to open the door. Therefore, the plain view exception does not validate Ammend's search.

### D. Inevitable Discovery

If the state can establish by a preponderance of the evidence that the fruits of a challenged search "ultimately or inevitably would have been discovered by lawful means," then the seized evidence is admissible even if the search violated the warrant requirement. *See Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also In re J.W.K.,* 583 N.W.2d 752, 756 (Minn.1998) (following *Nix* and holding that "[t]he rationale of the inevitable discovery exception * * * is that exclusion of evidence that would inevitably have been discovered would [improperly] put the prosecution in a worse position."). The inevitable discovery doctrine "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix,* 467 U.S. at 444–45 n. 5, 104 S.Ct. 2501.

The state argues that had Investigator Ammend not opened the door to the storage unit, he would have either (1) asked manager Eaves to do so while Ammend stood in front of the locker or (2) asked Eaves to do so and to inform Ammend if she saw whether "it had been cleaned out or had an automobile inside." But had manager Eaves entered into the storage unit at Ammend's request, she would have been operating as an agent of the state, and her entry into the storage unit would have violated the Fourth

Amendment for the same reasons that Ammend's entry did so.[6]

There is, however, a stronger argument to be made along inevitable discovery lines. In *Hodges,* this court applied the related independent source exception to the warrant requirement in a somewhat similar circumstance. There, police had obtained information which "by itself and without the information the police had obtained pursuant to their warrantless entry, would have justified the issuance of the warrant." *Hodges,* 287 N.W.2d at 416.

Prior to Investigator Ammend's discovery of the body, Investigator Erickson and Special Agent Hermann had already obtained information about Nancy Licari's credit cards and had begun using this information to track appellant. It was through the credit cards that investigators were able to track appellant to Minneapolis. When apprehended by Target security, appellant was wearing bloodstained clothing, was carrying Nancy's credit cards and had the keys to the Big Closet storage unit. At the same time, Minneapolis police found Smith's car, and a search of the car uncovered Nancy's purse, wallet, picture I.D. and jacket. The evidence on appellant's person would unquestionably have led the Isanti investigators to detain appellant and to seek and obtain a search warrant for the storage unit.

Therefore, the question is whether, absent the illegal search of the storage unit, the investigators would inevitably have pursued, found and searched appellant and uncovered the same evidence as was discovered on appellant on April 28, 1999.

Mindful of the *Nix* Court's statement that inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment," 467 U.S. at 444–45 n. 5, 104 S.Ct. 2501, our analysis of this issue reveals several open questions not addressed by the district court: whether, in the absence of the search of the storage unit on April 27, 1999, the Isanti investigators would have taken steps to discover the use of Nancy Licari's credit cards in Minneapolis during the time she was a missing person; whether they would have found the evidence that they obtained at the Target stores and the pawnshop; whether the Target personnel would have apprehended appellant; and whether the resulting search of his person would have been valid based on the information that investigators would have had at that time.

### III.

We have held that a case will not be remanded for more definite findings when it is clear that the district court considered and decided the fact issue in question. *See Buro v. Morse,* 183 Minn. 518, 521, 237 N.W. 186, 187 (Minn.1931). In this case, however, the district court did not reach the issue of the impact of the relocation clause on the landlord's actual authority to consent to a search or several factual issues crucial to inevitable discovery.

We have also held that the state may have waived an argument that would otherwise support an order denying a motion

---

**6.** Whether a private party conducting a search is acting as an agent of the state is a question of fact to be resolved by the district court. *State v. Buswell,* 460 N.W.2d 614, 615 (Minn.1990). In answering the question, the district court is to consider two crucial factors: "(1) whether the government knew of and acquiesced in the search and (2) whether the search was conducted to assist law enforcement efforts or to further the private party's own ends." *Id.* at 618 (citing *United States v. Walther,* 652 F.2d 788, 792 (9th Cir.1981)). Had the search proceeded in the way the state contemplates, the district court could only have concluded under this formula that Eaves was an agent of the state.

to suppress evidence if the argument requires a factual record and the state failed to develop that record at the omnibus hearing. *See Garza v. State*, 632 N.W.2d 633, 637 (Minn.2001). But we have also said:

We may, however, at our discretion, decide to hear [issues that are raised for the first time on appeal] when the interests of justice require their consideration and addressing them would not work an unfair surprise on a party.

*State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989).

In light of the legal issues suggested by this record but not addressed by the district court, the gravity of the offense charged, and the reversal of the grounds previously relied upon by the district court and the court of appeals to defeat appellant's motion to suppress, we conclude that the interests of justice require a remand. Accordingly, we remand for further proceedings to determine: (1) whether the "relocation" provision in the rental agreement, as it was to be applied by the landlord and appellant, provided such rights of "use" as would confer upon the landlord actual authority to consent to the search of the storage unit; and (2) whether, in the absence of the April 27, 1999, search of the storage unit, investigators would have inevitably pursued, found and searched appellant and uncovered the same evidence as was uncovered on appellant on April 28, 1999. *See* Minn. R.Crim. 28.05 subd. 2, 29.04 subd. 11 (empowering the Supreme Court to "order further proceedings to be had").

We direct the district court to conduct a hearing and make findings of fact on each of the remanded issues. If the district court finds that the relocation clause of the rental agreement reserved sufficient rights of "use" to provide the landlord with actual authority to consent to the search, or that

investigators would have inevitably pursued, found and searched appellant, the court shall enter an order denying a new trial. If the district court finds that the relocation clause of the lease does not reserve sufficient rights of "use" to provide the landlord with actual authority to consent to the search, and that investigators would not have inevitably pursued, found and searched appellant, it shall determine what evidence should have been suppressed as a result of the April 27, 1999, search and whether the failure to suppress that evidence requires a new trial.

Affirmed in part, reversed in part and remanded with instructions.

Concurring in part, dissenting in part, MEYER, J.

Dissenting, GILBERT, J.

GILBERT, Justice (dissenting).

While I concur with the majority's conclusion that if the police action here is considered an unlawful search, remand is appropriate, I respectfully write separately in dissent because I do not believe that the police engaged in an unlawful search. In this case, the police were responding to a missing persons report and were concerned for the welfare and safety of the Licaris. The Licaris had been reported missing for 3 days and appellant had left behind a suicide note. Nancy Licari's mother and appellant's sister informed the police that Nancy and appellant were renting a storage unit south of Isanti. The family allowed the police to look at the storage unit for clues as to the whereabouts of their missing family members. Accordingly, the police went to the unit with the permission of immediate family members who were acting on behalf of missing persons. Officer Ammend testified that he did not feel he was investigating a crime and hoped to find something in

the storage unit to indicate where the Licaris might have gone. In the process of undertaking a "cursory search for the family," Ammend stumbled upon a crime scene and now, as a result of that innocent discovery, the appellant is asking that all evidence found not only at the crime scene, but all evidence discovered thereafter, be suppressed.

The Fourth Amendment of the United States Constitution and Article 1, Section 10 of the Minnesota Constitution protect individuals against unreasonable searches and seizures. Absent exigent circumstances and probable cause, or consent, a warrantless entry and search is *per se* unreasonable, and violates the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *State v. Othoudt*, 482 N.W.2d 218, 222 (Minn.1992). In addition to probable cause and exigent circumstances, this court also recognizes the "emergency exception" to the warrant requirement. *See State v. Terrell*, 283 N.W.2d 529, 532 (Minn.1979). We have stated that "[t]he police may enter a dwelling without a warrant if they reasonably believe that a person within is in need of emergency aid." *Othoudt*, 482 N.W.2d at 223. During the course of legitimate emergency activities the police may seize any evidence that is in plain view. *Terrell*, 283 N.W.2d at 532.

To determine whether the "emergency exception" to the warrant requirement applies, this court uses an objective standard: "whether with the facts available to the officer at the moment of the seizure or search, would a person of reasonable caution believe that the action taken was appropriate." *Othoudt*, 482 N.W.2d at 223. However, other jurisdictions also look to the subjective intentions of the police in determining when to apply the emergency exception. *See, e.g., State v. Mountford*, 171 Vt. 487, 769 A.2d 639, 645 (2000) (requiring that the primary subjective motivation behind such warrantless searches be to provide emergency aid).

In *United States v. Cervantes*, the ninth circuit adopted a three-prong formulation of the emergency exception that includes a subjective prong. 219 F.3d 882, 890 (9th Cir.2000) (citing *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (1976)). For the emergency exception to be invoked, the following three-prong test must be satisfied:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) *The search must not be primarily motivated by intent to arrest and seize evidence.* (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Id.* at 888 (emphasis added). The facts of *Cervantes* are as follows. Firefighters called the police when they smelled a strong chemical odor emitting from an apartment building. *Id.* at 885. After investigating, a police officer determined that the odor was coming from the appellant's apartment, where the smell was the strongest. *Id.* at 886. The officer believed that the smell was methamphetamine, which he knew was highly explosive. *Id.* Fearing an explosion, the officer entered the apartment without the consent of the occupants. *Id.* Once inside the apartment, he found a substance he believed to be methamphetamine. *Id.* at 887. He promptly called for backup and evacuated the apartment building. *Id.* The defendant moved to suppress the evidence found as a result of the warrantless search. *Id.* at 887. The ninth circuit held that the

emergency exception applied to the officer's search of the apartment. *Id.* at 891.

The court in *Cervantes* stated that its justification for adopting the emergency exception stemmed from the police officer's role as a community caretaker when responding to emergency situations, not the police officer's role as criminal investigator. *Id.* at 889. Thus, there is no need for police officers to demonstrate probable cause that a crime has taken place when they are conducting a search pursuant to the emergency exception because they are not investigating a crime. *See also Mountford,* 769 A.2d at 645. The court in *Cervantes* also noted that the subjective motive of police officers is essential to safeguard citizens' Fourth Amendment rights: "absent probable cause, examining a government actor's motivation for conducting an emergency search provides a necessary safeguard against pretextual reliance on community caretaking interests to serve criminal investigation and law enforcement functions." 219 F.3d at 890. Therefore, the subjective expectation of the police officer is an essential component of the emergency exception because "[t]he distinguishing feature of * * * emergency assistance searches is that they are generated from a desire to aid victims rather than investigate criminals." *Mountford,* 769 A.2d at 645.

Based on the facts of the present case, the emergency exception to the warrant requirement may not be directly applicable. Here, the need to search the storage unit was less than immediate. There was, however, a heightened sense of urgency. Not only had the Licaris been missing for 3 days, but appellant had left a note hinting at suicide. More importantly, the police were clearly functioning in their role as community care responders as opposed to criminal investigators. Ammend admitted that he was not investigating a crime

when he searched the storage unit. In fact, Ammend was responding with the consent of family members to search the storage unit for clues of the Licaris' whereabouts. It is not unreasonable for a police officer, acting as a responsible public servant, in good faith, to look at the storage unit. The conduct of the police officer in this case, assisting a concerned family's search for a missing loved one by accessing the missing person's shared storage unit, should not be deterred. Under these specific facts, the emergency doctrine should be extended to cover the police officer's innocent discovery of a crime scene while he was searching for a missing person. Courts from around the country have found warrantless entry reasonable when police are confronted with cases of missing persons. *See People v. Wharton,* 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290, 324 (1991) (citing cases from California, New York, Arizona and Pennsylvania). When the police do not have probable cause to believe that they are going to a crime scene and are conducting a good faith search for missing persons, we should hold that under the emergency exception their actions do not amount to an unreasonable search or seizure.

Accordingly, I would affirm the district court on the grounds stated herein. The majority's decision based on these facts has the unfortunate consequence of discouraging good faith efforts of peace officers to look for missing persons or even engage in search and rescue missions because they risk unintentionally coming across inculpatory evidence, which may have to be excluded in any subsequent criminal proceedings. This rule of law might not only relate to direct evidence viewed at the scene, but all evidence that was uncovered thereafter, *see Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), even though ultimately all of the evidence in question

would have easily been properly collected within a short period of time.

Alternatively, if the actions of the officer are considered an unlawful search, I concur with the result reached by the majority that remand is proper and justified based on the procedural posture of this case. There are numerous facts in the record that more than reasonably support the inevitable discovery doctrine. Investigators had already obtained information about Nancy Licari's credit cards and had put out a Minnesota Crime Alert notification for Nancy Licari, appellant, and their cars. Furthermore, the longer Nancy Licari was missing, the more probable it would be that the police, following standard investigative protocol, would not only aggressively continue looking for her automobile, but they would also check the use of her credit cards and find that her credit card was being used by her husband, a fact clearly shown on a videotape from the Target store.

While it is true that the discovery of Nancy Licari's body at the storage unit on April 27, 1999, may have accelerated the apprehension of the appellant and the collection of further specific inculpatory pieces of evidence, there is nothing in this record or in any of the legal theories advanced by the appellant that would support a suppression of all evidence found thereafter. Even though all the parties concede that the police did not have probable cause to get a search warrant by April 27, in no time they would have had probable cause. The computer records at the storage unit in issue would show the comings and goings of appellant from the storage unit. In a relatively short period of time, Nancy Licari's body or her DNA evidence would have been uncovered at the scene. Therefore, even if discovery of the body of Nancy Licari at the storage unit should be suppressed, there is no basis to support the contention that all of the other evidence uncovered was the fruit of an unlawful search, or that DNA evidence or the massive amount of blood on the floor of the storage unit should be suppressed. Upon remand, the two unanswered questions that need to be answered are: would the evidence have been inevitably discovered and what, if any, evidence should be suppressed.

MEYER, Justice (concurring in part, dissenting in part).

I agree with the majority that the search of appellant's storage unit does not satisfy the apparent authority exception to the warrant requirement, nor does the plain view exception validate the search. I disagree with the majority's decision to remand to the district court to allow the state to develop a new record in support of a possible "inevitable discovery" exception to the warrant requirement. I disagree because our remand amounts to giving the state a post-hoc rationalization that is not supported in the existing record and that can never be legitimately developed on remand.

The majority opinion relies on *Nix v. Williams* for the general proposition that illegally seized evidence may be admissible if the state can establish by a preponderance of the evidence that the fruits of a challenged search "ultimately or inevitably would have been discovered by lawful means." 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In *Nix*, the Court examined whether evidence regarding the victim's location and the condition of her body could be admitted under the doctrine of inevitable discovery when the police learned of the body's location in violation of the suspect's right to counsel. *Id.* at 434, 104 S.Ct. 2501.

Robert Williams, the defendant in *Nix*, was a suspect in the disappearance of 10–

year–old Pamela Powers, who had been last seen on Christmas Eve at a YMCA in Des Moines, Iowa. *Id.* at 434, 104 S.Ct. 2501. An eyewitness had placed Williams at the scene of the disappearance, and the day after the girl disappeared several items of her clothing and Williams' clothing were discovered at a rest stop on Interstate 80 in rural Iowa. *Id.* at 434–35, 104 S.Ct. 2501. Based on the evidence at hand, police began searching for the missing girl along the interstate where the clothing was found. Two hundred volunteers involved in the search were directed to "check all roads, abandoned farm buildings, ditches, culverts, and any other" such hiding spots. *Id.* at 435, 104 S.Ct. 2501. The search commenced at 10 a.m. and was called off at 3 p.m. when Williams directed police to the body located in a ditch beside a gravel road, essentially within the area to be searched. *Id.* at 436, 449, 104 S.Ct. 2501.

On appeal, Williams' incriminating statements about the body's location were held to be inadmissible because the statements were obtained in violation of his right to counsel under the Sixth Amendment and the case was remanded for a new trial. *Id.* at 437, 104 S.Ct. 2501. Nevertheless, the Court held that the evidence of the body and post-mortem tests were properly admitted in the second trial because the evidence inevitably would have been discovered by a search for the victim that was already being pursued. *Id.* at 449–50, 104 S.Ct. 2501. To limit the speculative application of the inevitable discovery doctrine, the Court required that the proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444–45 n. 5, 104 S.Ct. 2501.

In *Nix* the investigation already underway was focused and vigorous. First, Williams was already in custody as a suspect in the girl's disappearance so there was no risk the evidence of the body would disappear. *Id.* at 435, 104 S.Ct. 2501. Second, the search for the girl was well underway and staffed by two hundred volunteers. *Id.* Third, the body was found within the area to be searched and near a culvert, which was precisely the kind of place the volunteers had been directed to search. *Id.* at 448–49, 104 S.Ct. 2501. Fourth, there was testimony that had the search continued it would have taken a short period of time, perhaps an additional three to five hours, to discover the body. *Id.* at 449, 104 S.Ct. 2501. Under these facts, the Court was satisfied that the application of the inevitable discovery doctrine involved no speculative elements and was based on historically verifiable facts. *Id.* at 449–50, 104 S.Ct. 2501.

Unlike the focused and vigorous investigation in play in *Nix*, the missing person search for Nancy Licari was generalized and routine. The police received the missing person report on April 24, issued a Minnesota Crime Alert notice within two days, and obtained Nancy Licari's credit card information. Officer Ammend testified there was absolutely no sense of urgency or exigency about the missing person matter before the body was discovered. The state in its brief characterizes the police search of the storage locker as "just looking for some missing persons, 'doing kind of a courtesy [sic] search for the family basically' and not investigating a crime." The police investigators testified at the omnibus hearing that before the body was found the police were not about to arrest Craig Licari and did not consider him a suspect in Nancy Licari's disappearance. The police were merely searching for anyone who had used the credit cards or had seen Nancy or Craig Licari.

It was only after the body was discovered that the police learned that two of Nancy Licari's credit cards had been used

in the Twin Cities area at a motel, a gas station, and a Target store. Only after the body was discovered did local police make contact with the Minneapolis Homicide Division, and with its help an investigation was begun in Minneapolis focused on Licari as a suspect. From that point on the entire police investigation was tainted by the knowledge that Nancy Licari had been killed and her body found in a storage locker owned by Craig Licari. Only after the body was discovered did the investigation become focused and vigorous, and eventually lead the police to Licari.

What are the historically verifiable facts in the instant investigation? Nancy Licari was missing for several days. The police were not focused on Craig Licari as a suspect in Nancy Licari's disappearance. Craig Licari was not in custody and thus was free to move the body. And the police were treating the matter as nothing more than a routine missing person investigation. There is no historically verifiable way to establish that the Isanti police officers would have succeeded in enlisting the assistance of the Minneapolis Police Department in a routine missing person investigation; that the police would have arrested Licari by April 28, wearing his bloody clothes, with the storage locker key in his pocket; or that Craig Licari would not have moved the body before the police reached him. It was the urgency of the homicide investigation that led the police to Licari, and any offer by the state of proof of independent discovery is mere speculation on what may have happened if they had not found the body. The proof is so tainted by police error that the inevitable discovery doctrine should not be applied.

I respectfully dissent.